Filed 6/23/22  In re D.O. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re D.O., A Person Coming Under Juvenile Court Law. | B315227 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP03120B) |
| Plaintiff and Respondent, | |
| v. | |
| S.W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ashley Price, Judge Pro Tempore. Conditionally affirmed with directions.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Rodrigo A. Castro-Silva, County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

In September 2021, the juvenile court terminated the parental rights of appellant mother S.W. and non-party father Steven H. over their daughter D.O. (then two years old) at a hearing brought under Welfare and Institutions Code section 366.26.[1]  Additionally, despite claims from both Mother and Steven of potential membership in Indian tribes, the court found the Indian Child Welfare Act (ICWA) inapplicable.

On appeal, Mother argues the court erred in declining to apply the parental-benefit exception to terminating her rights and further erred in finding ICWA inapplicable.  The Los Angeles County Department of Children and Family Services (DCFS) contends the court did not err in declining to apply the parental-benefit exception but does not oppose a limited remand for compliance with ICWA.

We conclude the court did not err in finding the parental-benefit exception inapplicable because substantial evidence supported its finding that D.O. would not benefit

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

from a continued relationship with Mother, and the court did not abuse its discretion in determining that it was in D.O.'s best interest to sever the parental relationship. We agree, however, that a limited remand for ICWA-compliance is appropriate.

## STATEMENT OF RELEVANT FACTS

### A. *The Court Removes the Children*

S.W. is the mother of Derek H. (born October 2008) and D.O. (born May 2019). Michael H. is Derek's father, and Steven H. is D.O.'s father. In May 2019, DCFS received a referral alleging general neglect of Derek. After an investigation, DCFS filed a petition on behalf of Derek and D.O., alleging counts under section 300, subdivisions (a), (b)(1), and (j). The petition included allegations that Steven had physically abused Derek, that Mother was aware of such abuse but failed to protect Derek, that Mother had a history of substance abuse, and that both parents had used drugs in front of Derek.

Mother filed an ICWA-020 form, indicating she "may have Indian ancestry," and indicated the Blackfoot and Cherokee tribes. At the May 2019 detention hearing (at which the court detained both children from Mother, releasing Derek to Michael and placing D.O. with foster parents), the court ordered DCFS to investigate Mother's claim and send appropriate notices. In July 2019, Steven filed an ICWA-020 form stating he "may have Indian

3

ancestry," and indicated the Apache tribe through his paternal grandmother.  In response to a question from the court at his arraignment, Steven indicated DCFS should speak with his eldest brother for more information.  The court again ordered DCFS to investigate the claim and send appropriate notices.

In its jurisdiction/disposition report, DCFS stated that it had been unable to obtain information regarding Mother's potential tribal membership because it had been unable to interview her.[2]  DCFS had sent notices to the Blackfoot and Cherokee tribes; each notice contained a statement that, according to the maternal grandmother, the maternal great grandmother had received a monthly check from the Blackfoot and Cherokee tribal bands.  The record contains no other details about DCFS's investigation of Mother's or Steven's potential Indian heritage.  However, the court later found ICWA inapplicable.

At the July 2019 adjudication hearing, Derek testified -- consistent with  earlier statements -- that Steven had been physically abusing him, including hitting and choking him, for several years.  Steven denied such abuse, and Mother claimed never to have witnessed it.  The children's counsel joined in DCFS's request that the petition, which had been previously amended to dismiss allegations regarding Michael, be sustained, and the court partially sustained the

---

[2]     Mother did not return phone calls and later informed a social worker she did not wish to speak with anyone about the allegations.

4

petition.[3]  Proceeding to disposition, the court removed the children from Mother and Steven, keeping Derek with Michael and D.O. with her foster parents.[4]  The court ordered DCFS to provide family reunification services, including for mother:  a drug/alcohol program, testing, parenting classes, and individual counseling.

### B.      *Six and Twelve-Month Review Hearings*

Following the children's detention, Mother and Steven visited Derek and D.O. on a weekly basis.  Despite DCFS's informing Mother that Steven's presence was distressing Derek, Mother continued to bring Steven.  Consequently, after August 2019, Derek no longer visited with Mother and D.O.  When Mother asked about visiting Derek, a children's social worker (CSW) suggested weekend visits monitored by Michael, but Mother refused, stating she did not want to deal with Michael.  With respect to court-ordered services, Mother initially missed multiple tests, failed to attend a scheduled meeting with the social worker, and expressed the view that her children had been taken from her for "'false reasons.'"  She eventually enrolled in a substance abuse program, testing negative for drugs and positive for alcohol.  She continued to deny Steven had physically abused Derek.

---

[3]      The court dismissed allegations relating to a violent altercation between Mother and the maternal grandmother.

[4]      In January 2021, the court terminated jurisdiction over Derek, granting Michael sole legal and physical custody.

In January 2020, she refused to provide DCFS with her residence address.  In May 2020, after D.O.'s foster parents stated they were not interested in providing a permanent home for D.O., she was moved to a new foster home.

Though the six-month review hearing was originally set for January 2020, it was delayed and continued for various reasons until it was eventually set as a 12-month review hearing in December 2020.  At the hearing, Mother testified that she visited D.O. weekly and called her daily.  During the visits, Mother would bring food and try to do the typical things a parent would do with a child that age, such as teach her the alphabet, draw a picture, or teach her about cleaning her hands.  Mother claimed D.O. loved the visits and called her "'momma.'"  Mother confirmed she did not believe Steven had physically abused Derek.  No other witnesses testified.

After argument from all counsel, the court found that returning D.O. to her parents would be unsafe and terminated family reunification services for both parents.  The court found Mother had only partially complied with her case plan and had made insufficient progress in understanding the potential risks to D.O., citing Mother's continued denial of Steven's abuse of Derek and her failure to undergo individual counseling.  The court set both a hearing to terminate parental rights under section 366.26 and a Permanency Planning Review Hearing.  At the request of both parents' counsel, the court ordered a bonding study.

## C.    *The Bonding Study and Other Reports*

The bonding study evaluator observed one visit between D.O. and Mother in July 2021.  She noted that when D.O. was dropped off for her visit with Mother, she excitedly went to Mother and focused her attention on Mother, but also pointed to the door where the foster mother had just exited and said, "'Momma.'"  D.O. appeared happy to see Mother, and the evaluator noted that while D.O. sought the evaluator out several times during the visit, it was clear she favored Mother.  The evaluator also noted an incident in which D.O. was playfully hitting Mother in the face with a small package of crackers and when Mother asked her to stop, D.O. did not comply.  D.O. also did not comply with Mother's requests to not hit the evaluator.

However, in other reports submitted to the court by DCFS after the 12-month review hearing, a monitor for Mother's previous visits with D.O. opined that D.O. was a "'happy kid'" who "'would already be happy (prior to [the] visit)'" with Mother, supplementing the evaluator's observation that D.O. was happy to see Mother.  The monitor also related that D.O. would seek out others (such as the monitor) during the visits, and that while D.O. enjoyed the visits with Mother, she was also happy and smiling when returned to the foster mother.  Similarly, a CSW noted that while D.O. had healthy visits with her parents, she "was not strongly bonded with either parent," did not cry at the end of the visits, and at times even wanted the visits to end early.  The CSW also noted that in previous

visits, D.O. was receptive to Mother when Mother played with her, but when Mother attempted to instruct her, she was "not wholeheartedly receptive . . . ." A DCFS addendum report opined that the monitored visits were "comparable to play dates and not a parent[-]child relationship." A status report submitted by DCFS noted that D.O. "ha[d] been thriving" in the care of her foster parent and appeared to have a "healthy and affectionate relationship" with her.

### D. *The Court Terminates Mother's Parental Rights*

The hearing to terminate parental rights was continued several times and, at an August 2021 hearing at which Mother was present virtually, Mother's counsel requested a continuance, indicating Mother would likely testify at the continued hearing. The request was granted, but Mother did not appear at the continued September 2021 hearing. No witnesses testified, and the court heard argument.

D.O.'s counsel agreed with DCFS's recommendation to terminate parental rights. Mother's counsel asked the court not to terminate parental rights, arguing that Mother had regularly visited with D.O., that D.O. would benefit from continuing the relationship, and that terminating it would be detrimental to D.O. Steven's counsel joined in the argument of Mother's counsel, adding that Steven cared deeply for D.O. DCFS's counsel acknowledged a bond

8

between D.O. and Mother but argued the court should nevertheless terminate both parents' rights because the bond did not outweigh the other factors the court should consider, such as the fact that D.O. was bonded to the foster mother, who provided for her daily needs. D.O.'s counsel agreed with DCFS's counsel, pointing out that Mother's relationship with D.O. was more friendly than parental, and arguing that the benefits of providing D.O. with a stable and permanent home outweighed the detriments of terminating parental rights.

Stating that it had read and considered the social worker's report, as well as DCFS's exhibits 1 through 8 (exhibit 6 was the bonding study), the court found the parental-benefit exception did not apply because D.O. had "been with the caregiver since birth," because her "daily needs are being met by the caregiver," and because D.O. was two years old and therefore "the benefits of permanency and stability through[] adoption are significant due to her age." The court expressly found that "any benefit accruing to the child from . . . her relationship with the parents is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption and that adoption is . . . in the best interest of the child."[5] Having found D.O. adoptable, the court terminated the parents' rights. Mother timely appealed.

---

[5] The minute order also contained the finding that "the parent has not maintained regular visitation with the child and
*(Fn. is continued on the next page.)*

9

# DISCUSSION

## A. *The Court Did Not Err in Failing to Apply the Parental-Benefit Exception*

"Even when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute.  One of these is the parental-benefit exception." (*In re Caden C.* (2021) 11 Cal.5th 614, 629.)[6]  Our Supreme Court articulated "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) *a relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Id.* at 631.)

On appeal from an order terminating parental rights, we review factual findings for substantial evidence and the decision whether termination of parental rights would be detrimental for an abuse of discretion.  (*In re Caden C.*,

---

has not established a bond with the child," though the order does not specify whether "parent" refers to Steven, Mother, or both.

[6]     Section 366.26, subd. (c)(1) "If the court determines . . . that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. . . unless . . . [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child" because "(i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

*supra*, 11 Cal.5th at 630.)  "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'  [Citation.]  The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'"  (*Id.* at 640.)  Further, "[a] court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""  [Citation.]  But ""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""""  (*Id.* at 641.)

### 1. Substantial Evidence Supports the Court's Findings

When considering whether a child would benefit from maintaining the relationship with the parent, "the focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'  ([*In re*] *Autumn H.* [(1994)] 27 Cal.App.4th [567,] 576.) . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their

11

parents." (*In re Caden C.*, *supra*, 11 Cal.5th at 632-633.) Further, "when examining whether the parent-child relationship exception applies[,] it is critical for the juvenile court at the second step of the analysis to consider the evidence showing whether the parent's actions or inactions 'continued or developed a significant, positive, emotional attachment from child to parent.'" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) An "emotional attachment is one where the child views the parent as more than a mere friend or playmate and who[se] interactions with the parent were not ambivalent, detached, or indifferent." (*Ibid.*)

The court found that D.O. was adoptable, that "any benefit accruing to [D.O.] from . . . her relationship with the parents is outweighed by the physical and emotional benefit [she] will receive through the permanency and stability of adoption[,] and that adoption is . . . in the best interest of [D.O.]" Mother contends that substantial evidence did not support the court's findings. We disagree.

While it appears undisputed that Mother visited D.O. on a weekly basis and the two shared an affectionate bond, substantial evidence supported a finding that D.O. would not benefit from maintaining the relationship with Mother. D.O. had never lived with Mother, and several social workers characterized their interaction as "comparable to play dates and not a parent[-]child relationship." The bonding study evaluator noted that Mother had difficulty instructing D.O. to stop inappropriate behavior. A social worker noted that D.O. was generally a "'happy kid'" who was happy to see

12

Mother, but was also happy to return to the foster mother, and at times even wanted the visits with Mother to end early.  There was also evidence that D.O. referred to her foster mother as "'Momma.'"  On this record, we find substantial evidence supported the court's finding that maintaining the parental relationship would not benefit D.O.[7]

---

[7]     Mother argues that *In re B.D.*, *supra*, 66 Cal.App.5th 1218 supports reversal.  We find the case inapposite.  There, in reviewing a juvenile court's finding that the parents had not shown that their children would benefit from a continued relationship, the appellate court found the juvenile court had improperly "relied heavily, if not exclusively, on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long-term and continued substance abuse" without "examin[ing] how the parents' continued substance abuse impacted the nature of the parent-child relationship."  (*Id.* at 1228.)  The appellate court also noted that "the record does not convince us that the juvenile court examined the nature of the parent-child relationship before the dependency proceeding or the visits and contact between the parents and children during the dependency proceeding, to evaluate whether a significant positive emotional attachment existed between the parents and children."  (*Ibid.*)

Here, by contrast, there is no evidence the juvenile court relied on Mother's failure to complete her reunification plan, and nothing suggests the court failed to consider the nature of her relationship with D.O.  In fact, the court made clear it had read and considered the bonding study.

13

## 2. The Court Did Not Abuse Its Discretion

"[I]n assessing whether termination [of the parental relationship] would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*In re Caden C.*, *supra*, 11 Cal.5th at 632.) "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at 634.) "When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption." (*In re B.D.*, *supra*, 66 Cal.App.5th at 1225.) Because "[i]nteraction between natural parent and child will always confer some incidental benefit to the child," "we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at 575.)

In deciding that it would not be detrimental to D.O. to terminate Mother's parental rights, the court stated that D.O. had "been with the caregiver since birth," that her "daily needs are being met by the caregiver," and that D.O. was two years old and therefore "the benefits of permanency and stability through[] adoption are significant due to her age." The court expressly found that "any benefit accruing to

14

the child from . . . her relationship with the parents is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption and that adoption is . . . in the best interest of the child."

Mother argues the court abused its discretion because its comments demonstrated it was improperly comparing whether the foster mother would be a better caregiver. Specifically, Mother points to the court's statement that D.O. had been with her caregiver since birth, and that her daily needs were being met by the caregiver.[8] We are unpersuaded.

We interpret the significance of the court's comment regarding D.O.'s placement since birth as a finding that Mother and D.O. had never developed a parental relationship because they had never lived together. Similarly, we interpret the comment regarding D.O.'s daily needs being met by the caregiver as recognition that severing the parental relationship with Mother would deprive D.O. only of a playmate and not a caregiver. We do not find these comments evidence of an improper comparison between Mother and the foster mother. Based on the factors discussed above, we conclude the court's determination that terminating Mother's parental rights would not be

---

[8] Mother also notes correctly that D.O. had been with her current caregiver only since May 2020, approximately half the child's life.

detrimental to D.O. was a reasonable one, and thus within its discretion.

## B. *A Limited Remand to Correct ICWA Defects Is Appropriate*

Mother argues the court erred in finding ICWA inapplicable when DCFS conducted an insufficient investigation and issued inadequate notices. DCFS does not oppose a limited remand to address the deficiencies in its investigation. Because the record contains little information about the investigation that was conducted about Mother's potential tribal membership, and no information that any investigation was conducted about Steven's potential tribal membership, we agree a limited remand is appropriate.

## DISPOSITION

The court's order terminating Mother's parental rights is conditionally affirmed. The matter is remanded to the juvenile court with directions to order DCFS to investigate Mother's and Steven's potential Indian heritage and, if relevant information not contained in previous notices sent in this case is discovered, send out new notices to the relevant tribes in accordance with ICWA and California law. DCFS shall thereafter inform the juvenile court of its findings and actions, and the court shall hold a hearing to determine whether the ICWA inquiry and notice requirements have been satisfied and whether D.O. is an Indian child. If the court finds she is an Indian child, it shall

16

proceed in conformity with ICWA and related California law. Mother shall be notified of all hearings related to this remand and shall have the right to appear and be represented by counsel.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

COLLINS, J.

CURREY, J.